UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| MARCUS TREMAINE DARDEN, | ) |
| Petitioner, | ) |
| v. | ) No. 3:22-cv-00155 |
| | ) (Crim. No. 3:17-cr-00124-1) |
| UNITED STATES OF AMERICA, | ) |
| Respondent. | ) |

## MEMORANDUM OPINION AND ORDER

Petitioner Marcus Darden, through counsel, has filed an amended Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255 (Doc. Nos. 18-1, 24),[1] in which he claims the Court should set aside his conviction in Case No. 3:17-cr-00124-1 due to ineffective assistance of counsel at trial. The Government filed a response in opposition (Doc. No. 19), and both parties agree this matter is ripe for review (see Doc. Nos. 37, 38). For the following reasons, Darden's Motion will be **DENIED**.

**I. BACKGROUND**

The Third Superseding Indictment charged Darden with conspiracy under the Racketeer-Influenced and Corrupt Organizations (RICO) Act (Count 1); conspiracy to traffic drugs (Count 2); assault in aid of racketeering (Count 12); and three substantive drug-trafficking crimes (Counts 15, 21, 23). (See Case No. 3:17-cr-00124-1 ("Crim."), Doc. No. 831). These charges related to Darden's leadership in the Gangster Disciples, a hierarchical street and prison gang with a regional operation (or "deck") in and around Clarksville, Tennessee. In March 2019, Darden was tried

---

[1] Darden filed his amended petition twice, once at Doc. No. 18-1 and once at Doc. No. 24. For convenience, the Court will cite to Doc. No. 18-1 when referring to Darden's motion.

along with four other members of the Gangster Disciples: Maurice Burks, Derrick Kilgore, Elance Lucas, and DeCarlos Titington. Darden was represented at trial by George Hawkins of the Hawkins Law Firm, and James Mackler of the Mackler Law Firm.

During trial, Danyon Dowlen, a long-standing member of the Gangster Disciples, testified for the Government "regarding the drug trafficking activities of, and violent crimes perpetrated by, Gangster Disciples members in Clarksville and elsewhere, as well as the structure of the Gangster Disciples enterprise." (See Crim. Doc. Nos. 1267 at 11; 1472–74). As part of his testimony, Dowlen explained that on January 6, 2012, "[o]ne particularly violent member, Brandon Hardison, murdered Derrick Sherden in cold blood over a drug debt and for breaking a solemn oath to repay it, and then he murdered Mr. Sherden's girlfriend Amanda Weyand to prevent her from being a witness." (See Crim. Doc. Nos. 1879 at 6; 1474 at 10–19, 28–34). As relevant here, Darden's counsel did not object to this testimony at trial, nor did they move for a mistrial.

On April 29, 2019, after nearly two months of trial, the jury found Darden guilty of Counts 1, 2, 15, 21, and 23 of the Third Superseding Indictment, and not guilty of Count 12. (Crim. Doc. No. 1360). The Court later sentenced Darden to 480 months in prison. (Crim. Doc. No. 1592 at 3). Darden initially challenged his conviction and sentence by filing a direct appeal to the Sixth Circuit, in which he argued the Court should not have admitted "two classes of testimony from government witnesses: (1) what he characterizes as expert testimony by witnesses who were not so qualified and (2) out-of-court statements by two coconspirator defendants." (See Crim. Doc. No. 1879 at Page: 28). The Sixth Circuit affirmed, finding that Darden's challenges either lacked merit or constituted harmless error. (Id. at Pages: 28–48).

Darden now resorts to § 2255 to challenge his conviction and sentence. His sole argument in this habeas proceeding is that Dowlen's testimony about Hardison's "unprovoked and

unwarranted murder of [Sherden], not to mention the poor innocent young girl, who was simply studying on her bed, was so inflammatory and prejudicial that [his] counsel should have objected and moved the Court for a mistrial." (Doc. No. 18-1 at 4). Darden claims that "[b]y failing to move for mistrial in the face of such inflammatory and unfairly prejudicial testimony," his counsel rendered constitutionally ineffective assistance and "deprived [him] of a substantial defense." (Id.).

## II. LEGAL STANDARD

"A prisoner seeking relief under 28 U.S.C. § 2255 must allege either: (1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid." Short v. United States, 471 F.3d 686, 691 (6th Cir. 2006) (citation and internal quotation marks omitted). Darden directs his claim to the first category because he argues that his Sixth Amendment right to effective assistance of counsel was violated.

A Sixth Amendment "ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal." Massaro v. United States, 538 U.S. 500, 504 (2003); see also Strickland v. Washington, 466 U.S. 668, 684 (1984) (noting that criminal defendants have a Sixth Amendment right to the effective assistance of counsel at trial). But to obtain relief under § 2255 on the grounds of ineffective assistance of counsel, the petitioner must establish that: (1) his "counsel's performance fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for the deficiency, the outcome of the proceedings would have been different." Griffin v. United States, 330 F.3d 733, 736 (6th Cir. 2003) (citing Strickland, 466 U.S. at 694).

### III. ANALYSIS

Darden argues that his trial lawyers were constitutionally ineffective because they did not object or move for a mistrial after Dowlen testified about Hardison's double homicide. "When deciding ineffective-assistance claims, courts need not address both" the deficient performance and prejudice "components of the inquiry 'if the defendant makes an insufficient showing on one.'" Campbell v. United States, 364 F.3d 727, 730 (6th Cir. 2004) (quoting Strickland, 466 U.S. at 697). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which . . . will often be so, that course should be followed." Strickland, 466 U.S. at 697. With this standard in mind, and for ease of analysis, the Court will address Darden's claim of prejudice before moving to whether his counsel rendered deficient performance at trial.

A. Prejudice

Proving prejudice is not easy because the petitioner must meet the "high burden" of demonstrating "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Monea v. United States, 914 F.3d 414, 419 (6th Cir. 2019) (quoting Davis v. Laffler, 658 F.3d 525, 536 (6th Cir. 2011)). A "reasonable probability" of prejudice means "a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. For several reasons, Darden cannot show prejudice from his lawyers' decision: (1) not to object to Dowlen's testimony about Hardison's murders; and (2) not to move for a mistrial after that testimony came into evidence.

As an initial matter, the Court disagrees that Dowlen's testimony "had nothing to do with the overall conspiracy" or that Hardison's murders "were not stated in the Indictment." (Doc. No. 18-1 at 4–5). This testimony clearly was relevant to Count One, which required the jury to decide whether Darden and others knowingly agreed to participate in the affairs of an enterprise (i.e. the Gangster Disciples) through a pattern of racketeering activity. The Indictment explicitly alleged

4

that the Gangster Disciples engaged in several types of racketeering activity, including "[o]n or about January 6, 2012," when "HARDISON, another Gangster Disciples member, . . . shot and killed [Derrick Sherden], a Gangster Disciples associate, . . . and killed [Amanda Weyand], the girlfriend of [Sherden]." (Crim. Doc. No. 831 at 14–15). The Indictment further alleged that Darden met with Hardison and other members soon after these murders to discuss whether the Gangster Disciples would punish Harden for his actions. (Id. at 15). This testimony was also relevant because members were supposed to avoid bringing undue attention or heat to the Gangster Disciples. (See Crim. Doc. No. 1460 at 13). These sophisticated criminal acts (including the murder of Sherden and Weyand) also demonstrated "that Defendants were not . . . simply a 'loose bunch of knuckleheads' from the small town of Guthrie, Kentucky who hung out together because they were friends, or just some freelancing guys co-opting the Gangster Disciples' name while doing their 'own thing.'" (Id. at 13–14). Accordingly, Darden is wrong to suggest that "[t]estimony of this nature should never have been presented to the jury because it did not relate to any of the charges in the Indictment." (Doc. No. 18-1 at 3).

Because Dowlen's testimony was admissible and highly relevant, the Court likely would have overruled any objection to this testimony under Federal Rule of Evidence 403. Indeed, counsel for Darden's co-defendant, Lucas, unsuccessfully raised this exact objection:

> [THE GOVERNMENT]. All right. Mr. Dowlen, I want to ask you now about a double murder that happened back on or about January 6th of 2012 in Clarksville. Are you familiar with that incident?
>
> [DOWLEN]. Which incident would that be?
>
> MR. PARRIS: Your Honor, may we approach for a minute, quickly?
>
> (Bench conference outside the hearing of the jury.)
>
> MR. PARRIS: This is strictly for the record. I just want to renew my objection to any of this coming in about this -- these two shootings as being irrelevant and 404

> -- 403, more prejudicial than probative. You've already ruled, but I feel like I needed to do that.
>
> THE COURT: Okay. It's noted for the record.
>
> MR. PARRIS: Thank you.

(Crim. Doc. No. 1474 at 10–11). Darden does not explain why *his* objection would have been more successful than Lucas' objection in that moment, and therefore he has not met his burden to show "the result of the proceeding would have been different" if his counsel objected to Dowlen's testimony. Monea, 914 F.3d at 419.

The Court also disagrees with Darden's argument (which he makes without any legal or factual support) that his lawyers' failure to move for a mistrial after Dowlen testified about the murders "deprived [him] of a substantial defense." (Doc. No. 18-1). As a matter of law, there is no reason to believe the Court would have granted a motion for a mistrial, applying the manifest necessity standard, when it refused to sustain Lucas' Rule 403 objection to Dowlen's testimony. See Delaine v. United States, 605 F. App'x 468, 472 (6th Cir. 2015) (citation and alterations omitted) ("Prejudice is not shown when, after looking at the transcripts, it is difficult to imagine the trial court responding favorably to a mistrial motion."). Nor is there anything in the record to suggest that the Court would have granted a motion for a mistrial nearly three weeks into a multi-defendant trial. Dowlen's testimony constituted only a subset of the overwhelming universe of inculpatory evidence presented against Darden and his co-defendants. The following summary of facts from the Sixth Circuit in Darden's direct appeal provides a description of the trial evidence:

> In the mid-2000s, the Clarksville deck [of the Gangster Disciples] was trying to establish its stature and reputation in the 615 region. Marcus Darden, already in a position of some authority in the deck, had ambitious goals for himself and for the Gangster Disciples in the region. In January 2006, several Gangster Disciples saw William Miller, a member of the rival Crips gang, "throwing down the pitchforks," a sign of disrespect toward one of the Gangster Disciples' symbols, the

pitchfork. Mr. Darden saw this as the perfect opportunity to put his deck—and himself—"on the map."

The next day, Mr. Darden and Rex Whitlock, another member of the Clarksville deck, saw Mr. Miller. They confronted and shot him. In the words of Tray Galbreath, a deck member who helped conceal the firearms used to shoot Mr. Miller, that shooting "[l]et the streets know that GD is a power to be reckoned" with. And gang violence in Clarksville escalated "starting from that point on."

Even so, the deck continued to cycle through booms and busts, often corresponding with its leaders' respective freedom or custody. For example, Mr. Whitlock and Mr. Galbreath were the main suppliers of cocaine for the deck, running kilos up from Atlanta. When they were arrested in 2008, the cocaine supply in the 615 region dried up for some time. Because most members did not have legitimate jobs, they drew their income primarily from drug sales. So Mr. Whitlock's arrest ended the deck's times of plenty, at least temporarily.

Things changed when Danyon Dowlen assumed leadership of the deck. He had joined the Gangster Disciples in the late 1990s while in custody, and he was in and out of prison several times up through 2010. That December, when Mr. Dowlen was released from prison, he found the Clarksville deck scattered from a lack of structure and leadership. He received a call from the regent for the 615 region, asking for help getting the Clarksville deck back "on count" (in good standing).

Mr. Dowlen agreed, and in mid-2011, he called a meeting of about thirty Clarksville-area Gangster Disciples. At that meeting, the deck elected its officers. Mr. Dowlen became the head of the deck. Elance Lucas, Derrick Kilgore, and DeCarlos Titington were also at that meeting, and Mr. Titington too took on a position of authority. Mr. Darden, who had previously served as the deck's enforcer because he was "prone to violence," was not at the meeting because he was in prison. But after his release, he became Mr. Dowlen's second-in-command. Together, Mr. Dowlen and Mr. Darden tried "to get everything organized" and take the deck "to bigger heights" than before.

Mr. Darden succeeded Mr. Dowlen as the head of the Clarksville deck and eventually rose to the 615 regency. His continued goal was to "raise the stature of [the gang], to have the street fame of it, [and] to be revered as a power to be reckoned with." He "ran [the deck] with an iron fist," purging weak members—and potential police cooperators—instead surrounding himself with loyal allies whom he could trust to do the gang's business.

The violence only grew with Mr. Darden's rise to power. There were smashings and eradications, especially for cooperation with law enforcement, no matter how

> slight; the murder of Malcolm Wright, a Blood, in response to the Bloods' killing of a Gangster Disciple, . . . and a retaliatory drive-by shooting against the Vice Lords, with Mr. Kilgore driving. One particularly violent member, Brandon Hardison, murdered Derrick Sherden in cold blood over a drug debt and for breaking a solemn oath to repay it, and then he murdered Mr. Sherden's girlfriend Amanda Weyand to prevent her from being a witness. For bringing "undue heat" upon the gang, he was brought before regional and state leadership for sentencing. They were initially inclined to eradicate him, but Mr. Dowlen convinced the tribunal not to execute him. Indeed, Mr. Hardison's standing in the deck increased, and he earned a place in the deck's blackout squad.

(Doc. No. 1879 at 4–6). In light of this substantial evidence connecting Darden to the Gangster Disciples and multiple racketeering activities in this case, the Court does not find that a motion for a mistrial by Darden would have been well-received.

For at least these reasons, Darden has not shown that his lawyers' failure to object to Dowlen's testimony or move for a mistrial "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686. Without this showing of prejudice, Darden's ineffective-assistance-of-counsel claim must fail.

B. <u>Deficient Performance</u>

Having determined that Darden's ineffective-assistance-of-counsel claim fails on the prejudice prong, the Court's inquiry could stop there. In the interest of completeness, however, the Court will address why Darden's claim also fails on the deficient performance prong.

Like with prejudice, proving deficient performance is difficult because "[j]udicial review of the lawyer's performance must be highly deferential, and indulge a strong presumption that a lawyer's conduct in discharging his duties falls within the wide range of reasonable professional assistance, since reasonable lawyers may disagree on the appropriate strategy for defending a client." Bigelow v. Williams, 367 F.3d 562, 570 (6th Cir. 2004) (internal quotation marks omitted). "A strategic decision cannot be the basis for a claim of ineffective assistance unless

counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness." Hughes v. United States, 258 F.3d 453, 457 (6th Cir. 2001). In other words, the petitioner has the burden to "show that counsel made errors so serious that he was not functioning as counsel guaranteed by the Sixth Amendment in order to establish deficient performance." Woods v. United States, 2011 WL 284618, at *2 (E.D. Tenn. Jan. 25, 2011) (citation omitted).

Darden has not offered any evidence to overcome the "strong presumption" that his attorneys' decision to remain silent during Dowlen's testimony or move for a mistrial "might be considered sound trial strategy." See Delaine, 605 F. App'x at 471 (quoting Strickland, 466 U.S. at 689). Instead, he merely contends that Dowlen's testimony, by its very nature, was so "inflammatory and prejudicial" and nonprobative that any reasonably competent lawyer would have objected to it. (See Doc. No. 18-1 at 3–5). The Court again disagrees.

There are many good trial reasons why Darden's counsel may have made the strategic decision not to object to Dowlen's testimony or move for a mistrial. As the Court already explained above, Hardison's murders were highly relevant to the issue of whether Darden and other members of the Gangster Disciples engaged in racketeering activities. That Lucas already (and unsuccessfully) objected to this testimony at the outset means an identical objection from Darden would have been redundant and futile. (See Crim. Doc. No. 1474 at 10–11). The record also suggests that his lawyers' trial strategy included efforts to separate Darden from these murders as much as possible. For example, during cross-examination, Darden's counsel prompted Dowlen to admit that "Marcus Darden here . . . had absolutely nothing to do with those two peoples' death[s]," and that "he didn't order the killing." (Id. at 133). During closing arguments, his counsel argued to the jury that it was Hardison and Dowlen, not Darden, who should be held responsible for killing Sherden and Weyand. (Crim. Doc. No. 1665 at 129–30). Therefore,

9

Darden's counsel may have decided not to object to Dowlen's testimony to avoid any suggestion that Darden was involved with the murders. See Quinones v. Miller, 2003 WL 21276429, at *50 n.78 (S.D.N.Y. June 3, 2003) (collecting cases regarding reasonable tactical decisions not to object to a witness's potentially damaging testimony).

Here, the Sixth Circuit's language from Moody v. United States is particularly instructive:

> The Sixth Amendment does not guarantee perfect representation but only reasonably competent representation. Thus, defense lawyers need not (and in fact should not) raise every colorable argument they can find. Tough judgment calls about what to challenge and what to let slide are part of lawyering. Such decisions only become deficient – that is, incompetent – when no reasonable counsel would have made the same choice at the time.

958 F.3d 485, 492 (6th Cir. 2020) (citations and internal quotation marks omitted). Even if Darden's counsel had valid arguments in support of a potential motion for a mistrial, the Court does not find that those arguments were so strong that every reasonable defense attorney would have made them. Darden's ineffective-assistance-of-counsel claim therefore independently fails on the deficient performance prong.

## IV. CONCLUSION

For the foregoing reasons, the Court finds that Darden is not entitled to habeas relief on his ineffective-assistance-of-trial-counsel claim. Accordingly, Darden's amended Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255 (Doc. Nos. 18-1, 24) is **DENIED** and his original 480-month sentence remains intact.

The Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2255 petitioner. See Rule 11(a), Rules Gov'g § 2255 Cases. A § 2255 petitioner "may not" appeal a district court's denial of habeas relief without the issuance of a certificate of appealability. 28 U.S.C. § 2253(c)(1)(B); see also Fed. R. App. P. 22(b)(1). "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of

the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A § 2255 petitioner "seeking a [certificate of appealability] must prove 'something more than the absence of frivolity' or the existence of mere 'good faith' on his or her part." Miller-El v. Cockrell, 357 U.S. 322, 338 (2003) (citing Barefoot v. Estelle, 463 U.S. 880, 893 (1983)). Instead, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Id. (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)).

After thoroughly reviewing Darden's ineffective-assistance-of-counsel claim and the legal issues involved, the Court **DENIES** a certificate of appealability on his claim because reasonable jurists would not find debatable or wrong the Court's rejection of the claim.

This is a final order. The Clerk shall enter judgment in this case in accordance with Federal Rule of Civil Procedure 58. The Clerk shall also enter a copy of this Memorandum Opinion and Order and Judgment in Case 3:17-cr-00124-1.

IT IS SO ORDERED.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE